UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

BART GRISSOM,

        Plaintiff,

    v.                                                                           Case No. 21-cv-274-JPG

RICHARD WATSON and DAVID MARCOWITZ,

        Defendants.

## MEMORANDUM AND ORDER

This matter comes before the Court on the motions for summary judgment filed by

defendant David Marcowitz, a doctor working at the St. Clair County Jail ("Jail") (Doc. 66), and

St. Clair County Sheriff Richard Watson (Doc. 68).  Plaintiff Bart Grissom, a detainee in the Jail

at the relevant times, has responded to the motions (Docs. 70 & 71), and the defendants have

filed their respective replies (Docs. 72 & 73).  The Court concludes that a reasonable jury could

find that Dr. Marcowitz behaved in a deliberately indifferent or objectively unreasonable manner

in persisting with ineffective pain treatment—solely ibuprofen—for Grissom's pain.  However,

no reasonable jury could find Dr. Marcowitz's other medical decisions were unconstitutional or

that Grissom otherwise faced unconstitutional conditions of confinement.

## I.    Background

Grissom filed this civil rights action *pro se* pursuant to 42 U.S.C. § 1983.  In his

Complaint, he alleges that Sheriff Watson subjected him to unconstitutional conditions of

confinement at the Jail, including overcrowding, lack of bed space, lack of working sinks,

exposure to insects, black mold, and lack of cleaning supplies in the infirmary and in the cell

blocks, which resulted in Grissom becoming ill in February and/or March 2021 (Count 1).

Grissom also alleges that Dr. Marcowitz denied him timely and adequate medical attention for

his fractured ankle and toe at the Jail in February and/or March 2021.  He asserts that in so acting, Sheriff Watson and Dr. Marcowitz violated his Fourteenth Amendment due process rights or his Eighth Amendment right to be free from cruel and unusual punishment.

## II.    Summary Judgment Standard

Summary judgment is appropriate only if the moving party can show "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celetex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party has the burden of establishing that no material facts are genuinely disputed.  *Lawrence v. Kenosha Cty.*, 391 F.3d 837, 841 (7th Cir. 2004).  Any doubt about the existence of a genuine issue must be resolved in favor of the nonmoving party.  *Id.*

When presented with a motion for summary judgment, the Court does not decide the truth of the matters presented, and it cannot "choose between competing inferences or balance the relative weight of conflicting evidence."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hansen v. Fincantieri Marine Grp., LLC,* 763 F.3d 832, 836 (7th Cir. 2014) (citations omitted).

Once a properly supported motion for summary judgment is filed, the adverse party "must set forth specific facts showing there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250.  The Court must then "view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party."  *Hansen*, 763 F.3d at 836.  If the "evidence is such that a reasonable jury could return a verdict for the nonmoving party[,]" then a genuine dispute of material fact exists.  *Zaya v. Snood*, 836 F.3d 800, 804 (7th Cir. 2016).

**IV.    Dr. Marcowitz's Motion for Summary Judgment (Doc. 66)**

In Dr. Marcowitz's motion for summary judgment, he does not contest that Grissom had an objectively serious need for medical treatment of his pre-existing ankle and/or toe injury, but he argues that no evidence shows his response to that need was objectively unreasonable or that it caused Grissom any harm.  Grissom maintains Dr. Marcowitz's examinations of him, his refusal to give him an orthopedic boot, and his refusal to refer him to a specialist was objectively unreasonable in the circumstances.

A.    Relevant Facts

The following facts are offered by the parties in their summary judgment materials with respect to Grissom's claim against Dr. Marcowitz.  To the extent any facts are disputed, they are presented in the light most favorable to Grissom.

Grissom was arrested and taken to the Jail, where he resided from February 5, 2021, to May 12, 2021, after which he was transferred to Menard Correctional Center ("Menard").  He was held as a pretrial detainee on some charges as well as on a warrant for revocation of parole on a prior conviction.

Jail Medical Care Generally

Detainees at the Jail could request non-urgent medical care by submitting a health service request form to obtain an appointment with a nurse during sick call.  The nurse would then assess the detainee's symptoms and either schedule an appointment with the doctor serving the jail or call the doctor for treatment instructions.

At all relevant times, Dr. Marcowitz was the doctor for Jail detainees.  He was employed by Wexford Health Sources, Inc., a contractor engaged to provide medical services for the Jail. Dr. Marcowitz usually visited the Jail in person once a week but also gave treatment orders by

3

telephone in response to nurses' reports of patient symptoms.  The Jail nurses, not Dr. Marcowitz, scheduled his weekly in-person appointments with detainees.

Grissom's Medical Needs

Before he was arrested on February 5, 2021, Grissom had suffered an injury to his ankle. He had fractured his left ankle in 2003, which resulted in implanted metal hardware—in medical terms, an open reduction internal fixation ("ORIF").  In 2020, Grissom was experiencing pain and/or swelling in both feet and ankles, so in September 2020 he consulted Dr. Anderson, a podiatrist.  Dr. Anderson took x-rays and assessed Grissom with arthritis in both ankles, bursitis of the right foot, and pain in both feet, but he did not observe any acute fracture, dislocation, neoplasm, or foreign body.  Dr. Anderson recommended Grissom consider referral to an orthopedic surgeon for a left ankle fusion.  He also issued Grissom an orthopedic boot to help relieve pain while waiting for surgery and advised him not to put any weight on his left foot when not wearing the boot.  Dr. Anderson's medical notes indicated Grissom worked in construction and would not be able to wear the boot while working.

On December 26, 2020, Grissom visited a hospital emergency room with complaints of pain in his ankle, feet, and other areas.  An x-ray revealed swelling and changes to the previous ORIF, but no acute fracture in his left ankle.  The ER recommended a follow-up MRI, but Grissom did not obtain one.

When he was arrested on February 5, 2021, Grissom was wearing his orthopedic boot but the arresting officers took it from him along with his other property.  They failed to note the boot on the list of items confiscated.  Grissom reported to a nurse filling in his pre-booking medical questionnaire that he had an injury to his left leg and that a bone fusion was needed.  He also reported foot and ankle problems during the booking process, but Jail personnel failed to make a

note in his booking papers.

On February 17, 2021, at his intake screening, Grissom reported to a nurse that he had an orthopedic screw in his left ankle, but he expressed no complaints at that time.

<u>Dr. Marcowitz's Treatment of Grissom</u>

On February 24, 2021, Grissom got into a fight with another inmate. In a medical examination conducted after the fight, Grissom complained to a nurse that his left ankle hurt and that it had been previously injured. The ankle was swollen, and Grissom was unable to put full weight on it. The nurse consulted Dr. Marcowitz by phone, and he ordered an x-ray of Grissom's left ankle and ibuprofen as needed. The x-ray showed no abnormalities, that is, that the ORIF remained intact. Indeed, the radiology report indicated no evidence of an acute fracture, no gross lytic or blastic bone lesions, no dislocation, intact hardware, and a sclerotic lesion (slow growing changes to the bone[1]) from the old fracture. This was the first time Dr. Marcowitz was involved with Grissom's care or aware that he had an ankle problem.

Grissom came to believe that he had a broken ankle and a swollen or broken toe and that Dr. Marcowitz's response was inadequate because he did not order a cast, protective gear, medication, or a bone fusion. He further came to believe that the x-ray would not be adequate to reveal the break in his ankle, so he needed at ultrasound or MRI to identify the injury so he could see a specialist.

Dr. Marcowitz saw Grissom in person on March 24, 2021, to follow up. Grissom told him at that time that he was supposed to have had ankle surgery following Dr. Anderson's referral in September 2020. Dr. Marcowitz again reviewed Grissom's February 2021 radiology

---

[1] WebMD, What to know about sclerotic lesions, available at https://www.webmd.com/a-to-z-guides/what-to-know-about-sclerotic-lesions (visited Feb. 1, 2023).

report and ordered and reviewed the records from Dr. Anderson.  Dr. Marcowitz concluded that Grissom had had an ORIF in the past and that he was not compliant in wearing the orthopedic boot.  Dr. Marcowitz further concluded that there was no urgent need for Grissom to have surgery at that time and that Dr. Anderson had recommended considering surgery as one treatment option but not one that was urgently medically necessary.  Dr. Marcowitz told Grissom he did not have the authority to order a boot.  He further declined to refer Grissom to an orthopedic surgeon for a bone fusion, which he viewed as a last resort because of a fusion's possible negative consequences on permanent range of motion and continuing pain.

From March 26, 2021, to April 7, 2021, Grissom submitted six health service request forms about pain in his ankle and toe.  He saw Dr. Marcowitz again on April 14, 2021.  Grissom reminded him of Dr. Anderson's recommendation eight months earlier.  Grissom also complained of a bunion on his right foot.  Dr. Marcowitz again reviewed Grissom's x-ray and in a physical exam noted no swelling or deformity at the bunion site.  He continued to prescribe ibuprofen.  Except for continuing to prescribe medication, this was the last time Dr. Marcowitz was involved in Grissom's medical care or heard any complaints about Grissom's ankle.

During Dr. Marcowitz's personal encounters with Grissom, he did not observe signs of uncontrolled pain or significant difficulty with ambulation, although he did not observe Grissom walk up or down stairs.  No medical or Jail staff reported that Grissom had significant difficulty walking or climbing stairs.  In light of the x-ray showing no acute injury and the lack of significant symptoms during in-person medical encounters, Dr. Marcowitz declined to order any treatment other than ibuprofen.

After Grissom left the Jail, no medical provider ever ordered an orthopedic boot, and he never had bone fusion surgery.  He was eventually able to move around better, although he was

6

still in a lot of pain.  Grissom speculates that his arthritis worsened because he had to walk up and down stairs at the Jail.

      B.    <u>Legal Standard</u>

Historically, the Court has applied to convicted prisoners and pretrial detainees the same Eighth Amendment test for deliberate indifference to the health needs of convicted prisoners. *See Miranda v. County of Lake*, 900 F.3d 335, 350-51 (7th Cir. 2018); *Burton v. Downey*, 805 F.3d 776, 784 (7th Cir. 2015).  The test for an Eighth Amendment violation has two components, an objective and a subjective one.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  First, the need about which the inmate complains must be objectively serious.  *Id.*  Second, the defendant must have a sufficiently culpable state of mind, that is, he must at a minimum be deliberately indifferent.  *Farmer*, 511 U.S. at 834.  He is deliberately indifferent if he "knows of and disregards an excessive risk to inmate health or safety."  *Id.* at 837.

The Court of Appeals for the Seventh Circuit, relying on the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), has since held that the objective reasonableness standard, not the deliberate indifference standard, applies to all Fourteenth Amendment conditions-of-confinement claims brought by pretrial detainees.  *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019).  This includes claims of inadequate medical care.  *James v. Hale*, 959 F.3d 307, 318 (7th Cir. 2020); *Miranda*, 900 F.3d at 352.  *Miranda* held that the controlling inquiry in the medical context consists of two steps.  The first step focuses on the intentionality of the defendant's conduct and asks "whether the medical defendant[] acted purposefully, knowingly, or perhaps even recklessly when he considered the consequences of his handling of [plaintiff's] case."  *See Miranda*, 900 F.3d at 353.  The second step asks whether the challenged conduct was objectively reasonable based on the totality of the circumstance faced by the

defendant. *Id.* at 354.

It is unclear whether Grissom was a pretrial detainee or a convicted criminal. If Grissom were a pretrial detainee, the applicable legal standard for his conditions of confinement claim against Dr. Marcowitz is the Fourteenth Amendment's objective reasonableness standard. *See Miranda*, 900 at 352. However, Grissom was also detained on a warrant to revoke his probation, and he was transferred directly into Menard when he left the Jail. The Eighth Amendment's deliberate indifference standard would apply if he were a convicted criminal. The Court need not decide which applies because there are genuine issues of material fact preventing summary judgment under either standard.

C.   Discussion

The evidence shows that before and throughout his stay at the Jail, Grissom suffered from pain in his left ankle. Dr. Marcowitz became aware of Grissom's pain on February 24, 2021, when a nurse reported Grissom's condition after he had been in a fight. Dr. Marcowitz promptly ordered an x-ray and ibuprofen as needed. The x-ray showed no abnormalities. In the circumstances, no reasonable jury could find Dr. Marcowitz was deliberately indifferent to Grissom's medical needs or that his response was unreasonable. He prescribed standard conservative diagnostic and treatment measures designed to determine whether an urgent problem existed and to treat pain in the meantime.

At Grissom's follow-up in-person visit on March 24, 2021, Dr. Marcowitz learned for the first time of Dr. Anderson's prior assessment of Grissom's ankle. Dr. Marcowitz again reviewed the February 2021 x-ray report and ordered Dr. Anderson's records. It was at this point that Dr. Marcowitz became aware of the objective evidence supporting Grissom's complaints of pain, Dr. Anderson's recommendation that Grissom should only walk in a boot to prevent pain, and Dr.

Anderson's recommendation that Grissom consider a bone fusion.

Dr. Marcowitz declined to order or refer Grissom for a bone fusion based on Dr. Anderson's mere recommendation that Grissom consider the bone fusion and based on his own assessment of potential negative side-effects associated with bone fusion. This was not deliberate indifference. Clearly Dr. Anderson and Dr. Marcowitz had a difference of opinion about the way Grissom's ankle should be treated, but a difference of medical opinion about treatment is not deliberately indifferent where the opinion is not a "substantial departure from accepted professional judgment, practice, or standards." *See Estate of Cole by Purdue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996). The Court will generally "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019) (internal quotations omitted). Grissom has not tendered any evidence that Dr. Marcowitz's opinion was so far outside the realm of professional standards to raise the inference of deliberate indifference. Nor has Grissom pointed to any evidence that Dr. Marcowitz's decision not to refer Grissom for a bone fusion was objectively unreasonable in the circumstances.

Dr. Marcowitz's decision to continue with ibuprofen and not to pursue additional pain management strategies or orthopedic assistance devices or to refer him to a specialist may amount to deliberate indifference or objectively unreasonable treatment. Persistence in a course of treatment known to be ineffective can amount to deliberate indifference. *White v. Woods*, 48 F.4th 853, 862 (7th Cir. 2022); *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016). On March 24, 2021, Grissom was still in pain despite the liberal allowance of ibuprofen. Shortly thereafter, Dr. Marcowitz became aware of Dr. Anderson's unequivocal instruction not to walk without a

boot to prevent pain.  The boot was a course of treatment that did not have the potential negative side-effects of a bone fusion.  Nevertheless, Dr. Marcowitz did not alter the course of Grissom's treatment, offering as his reasons that he did not have the authority to prescribe an orthopedic boot and that Grissom had been non-compliant in the past with Dr. Anderson's order to wear a boot.  Neither of these reasons was an exercise of professional medical judgment that would negate deliberate indifference or objective unreasonableness by persisting in an ineffective treatment.

Based on the evidence in the file, a reasonable jury could find that Dr. Marcowitz behaved in a deliberately indifferent or objectively unreasonable manner in persisting in treating Grissom only with ibuprofen after it was not effective to control his pain.  Accordingly, the Court will deny summary judgment on that claim but will grant it to Dr. Marcowitz as to all other aspects of Grissom's claim against him.  The Court is further satisfied that a reasonable jury could find Grissom suffered sufficient harm by unnecessarily prolonged pain.

## IV.    Sheriff Watson's Motions for Summary Judgment (Doc. 68)

In Sheriff Watson's motion for summary judgment, he argues that the Jail conditions to which Grissom was exposed were not serious enough or lengthy enough, either individually or in combination, to rise to the level of a constitutional violation.  Watson also argues that Grissom cannot maintain this suit because he did not suffer any physical injury from those conditions, because Watson is entitled to qualified immunity, and because Watson was not responsible for maintaining the Jail building.  Watson has not supported his final two arguments with relevant discussion or caselaw—indeed, he only mentions them in his motion itself—so the Court

confines its consideration to the first two arguments[2]:  (1) the Jail conditions to which Grissom was exposed did not pose an objectively serious risk to his health or safety and (2) Grissom did not suffer any physical injury.  In Grissom's response, he argues the conditions of which he complained caused him physical pain to his injured leg and loss of sleep.

A.    Relevant Facts

The following facts are offered with respect to Grissom's claim against Sheriff Watson. To the extent any facts are disputed, they are presented in the light most favorable to Grissom.

Grissom resided at the Jail from February 5, 2021, to May 12, 2021.  It is unclear whether he was held as a pretrial detainee, on a warrant for revocation of parole on a prior conviction, or both.  The day he arrived at the Jail, he was moved to a holding cell where he spent almost three days.

Infirmary (February 8-18, 2021)

Grissom was then moved to the infirmary because of his ankle/leg injury, where he spent ten days.  During his stay in the infirmary, there were cockroaches by the showers and toilets, and Grissom had to sleep in a stackable plastic bunk (a "boat") placed on the ground because of overcrowding.  This is a rendering of a "boat" from a website—www.cortech.com—referenced in Watson's discovery responses:



Specifically, the infirmary had seven permanent beds, and on the days Grissom was there

---

[2] Perfunctory, underdeveloped and unsupported arguments are waived.  *See Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000); *Perry v. Sullivan*, 207 F.3d 379, 382 (7th Cir. 2000).

it housed ten to twelve individuals, leaving three to five to use boats each night rather than normal beds.  When Grissom slept in a boat, he was worried about being exposed to insects and, although they crawled on his bed, they did not crawl on him.  He also worried about other people stepping on him or walking over him.  In fact, a few times others tripped or stumbled over his boat when they were heading to the urinal, although Grissom was not injured as a result.  He also had trouble and suffered pain getting out of the boat to use the bathroom, especially with his injured ankle.

Lower Level B (February 18-24, 2021)

From the infirmary Grissom was moved to Lower Level B area ("LL-B"), where he stayed for approximately six days.  LL-B had 32 permanent beds, but Grissom continued to sleep in a boat because of overcrowding.  Grissom estimated there were approximately forty people housed there with six or seven sleeping in boats, but Jail records show that LL-B housed 33 to 35 individuals while Grissom was there.

While Grissom slept in a boat, insects like gnats, flies, fruit flies, and ants crawled near and on him, and he continued to have trouble getting up from the boat with his injured ankle.  He also observed gnats and fruit flies on the urinals.  He observed black mold near the window and on a large section of a wall in the shower area, which he speculates caused him high blood pressure and migraine headaches.  Grissom asked the correctional officers four times for bleach, and the officers said they would see what they could do, but Grissom never received any bleach.  Nevertheless, Jail staff provided detainees cleaning supplies like a mop and water, a broom, and trash bags every day and occasionally a cleaning powder.  Grissom was not able to clean with those supplies because of his ankle injury so he relied on other detainees to clean.

The LL-B bathrooms were also slippery from being wet because water would shoot out

from the showers.  The wet floor caused Grissom to fall twice.

First Floor AA (February 24-May 12, 2021)

From LL-B, Grissom was moved to First Floor AA area ("FF-AA"), where he was housed until he was released on May 12, 2021.  In this area, Grissom was exposed to gnats all over and fruit flies by the trashcans and showers, although he was no longer forced to sleep in a boat.  He described the showers as disgusting because they were not cleaned well or often by the other detainees.  Grissom was also forced to walk short distances and up or down stairs in thin, loafer-type shoes to get his meals, mail, healthcare, or anything else, which hurt his ankle.

Jail Maintenance

The St. Clair County Public Building Commission was responsible for maintaining the Jail and contracted to have the Jail treated for insects and other pests monthly, including three times while Grissom was detained.  Maintenance Request Forms were submitted by maintenance staff whenever a problem was noted.  All 136 Maintenance Request Forms submitted during Grissom's stay at the Jail were responded to for repair or remediation.  None of them noted the problems of which Grissom complains.

Jail records show cleaning supplies, including antibacterial spray, mops and water, brooms, and trash bags were distributed in FF-AA daily as they were in LL-B.  The records also show the Jail sprayed a sanitizer weekly to all different sections of the jail.

Grissom's Injuries

No medical provider ever diagnosed Grissom with an injury attributable to the conditions of the Jail and, aside from the pain he suffered from moving on his injured ankle, he has not alleged any physical injury.  He never submitted a sick call slip for any injury other than his ankle.  Nevertheless, his headaches decreased and his blood pressure was lower when he was

transferred in May 2021 to Menard.

    B.   <u>Legal Standard</u>

To prevail on a conditions of confinement claim, a plaintiff must prove two things.  First, the conditions of confinement must be objectively serious enough to amount to a constitutional deprivation; they must result in the denial of "'the minimal civilized measure of life's necessities.'"  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)); *see Smith v. Dart*, 803 F.3d 304, 309 (7th Cir. 2015).  Second, the official must have a sufficiently culpable state of mind.  *Farmer*, 511 U.S. at 834.

As with medical care claims discussed above, what this second requirement demands depends on whether the plaintiff is a pretrial detainee or a convicted prisoner.  *See Kingsley v. Hendrickson*, 576 U.S. 389, 395 (2015).  If Grissom were a pretrial detainee, the applicable legal standard for his conditions of confinement claim against Sheriff Watson is the Fourteenth Amendment Due Process Clause's objective reasonableness standard.  *See Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019).  The Eighth Amendment Cruel and Unusual Punishment Clause's deliberate indifference standard would apply to claims arising if he were a convicted criminal.

The Court need not decide which standard applies because Watson's motion turns on the preliminary question under *either* standard—were Grissom's conditions objectively serious, that is, was he denied "the minimal civilized measure of life's necessities" or exposed to conditions "posing a substantial risk of serious harm."  *Farmer*, 511 U.S. at 834; *accord Hardeman*, 933 F.3d at 827 (Sykes, J., concurring); *Smith*, 803 F.3d 309-10.  Both pretrial detainees and convicted prisoners are entitled to "the minimal civilized measure of life's necessities," including such things as "reasonably adequate ventilation, sanitation, bedding, hygienic materials, and

14

utilities." *Hardeman*, 933 F.3d at 820 (internal citations and quotations omitted); *Smith*, 803 F.3d at 310 (food, clothing, shelter, and medical care).  The objective reasonableness of a plaintiff's conditions of confinement depends on the duration and severity of his exposure to the conditions. *See Hardeman*, 933 F.3d at 824.  Only after finding objectively serious conditions does it make a difference whether the Eighth or Fourteenth Amendment standard applies.

      C.    <u>Discussion</u>

      The Court first notes that it is careful to examine only the conditions Grissom actually pleads in his complaint or closely related conditions.  The Court concludes that, based on the evidence in the file, no reasonable jury could find Grissom was denied "the minimal civilized measure of life's necessities" or exposed to conditions "posing a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  The Court considers the conditions individually and in combination, taking account of their severity and duration.

      As a result of Jail overcrowding, there were not enough regular beds for all the detainees, forcing some to sleep in boats placed on the floor.  Grissom does not point to any other consequence of alleged overcrowding in the Jail that might be deemed intolerable in human society. *See Rhodes v. Chapman*, 452 U.S. 337, 348 (1981).  From the picture of a boat included earlier in this order, it is clear that a boat provided a defined and adequate space designed for a detainee to sleep slightly raised off the ground.  Sleeping in a boat posed inherent problems from being close to the floor such as being nearer to insects crawling on the floor or substances spilled on the floor.  It also posed a tripping hazard to other detainees who may fall on the detainee sleeping in the boat.

      However, Grissom slept on a boat only during the 16 days he was housed in the infirmary and in LL-B.  He saw insects that may have come near him or scared him, but which never bit

him or caused any medical problem.  A couple of detainees tripped over him, but he suffered no injury.  True, it was more difficult and painful for him to get into and out of the boat because of his ankle injury than it would have been to get in and out of a regular bed, but getting in and out of the boat was likely an activity that occurred only on a few occasions a day, and for Grissom, only for 16 days.  The overcrowding that forced Grissom to sleep in a boat for 16 days might have been unpleasant, but it simply did not lead to intolerable conditions, deprive him of one of life's necessities, or expose him to a substantial risk of serious harm.

Grissom also complains about unsanitary conditions such as the presence of insects in all his housing assignments, black mold in in LL-B, and a lack of cleaning supplies.  The evidence shows that there were ordinary household insects like cockroaches, fruit flies, and ants in the Jail for the entire 13 weeks Grissom was detained, but that the Jail was sprayed monthly for pest control.  While the spraying was not 100% successful in eliminating all the insects, the presence of some insects in any group living setting is not unheard of and, while not wonderful, certainly does not deprive one of life's necessities unless outrageously excessive.  The residual insects Grissom describes gathering around toilet facilities and garbage bins pale in comparison to insect and rodent infestations found to constitute objectively serious conditions.  *See Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) ("cockroaches that were 'everywhere,' 'crawling on his body' (along with mice) and 'constantly awaken[ing]' him, and 'causing the environment to be unsanitary" and caused significant harm while the jail sprayed for pests only twice in sixteen months); *White v. Monohan*, 326 F. App'x 385, 388 (7th Cir. 2009) (over five years, "'bugs, roaches, spiders, wasps, [and] bees' had bitten and stung him so often as to leave multiple scars, wounds, and sores, causing him internal injuries").  Grissom's exposure to insects is simply not the kind of intolerable situation that would amount to an objectively serious

16

condition.

As for black mold, it can pose a serious health risk.  *See, generally*, Nat'l Ctr. for Enviro. Hlth., Basic facts about mold and dampness (Nov. 14, 2022), available at https://www.cdc.gov/ mold/faqs.htm (visited Jan. 31, 2023).  But Grissom was exposed only in LL-B, where he was housed for six days, and mold was only in the shower area and the window area.  Grissom speculates that his headaches and high blood pressure were caused by mold exposure, but this speculation is totally unsupported.  No reasonable jury could find that exposure to black mold amounts to an objectively serious condition of confinement where the mold was confined to a wall and a window, the exposure was for less than a week, and no evidence plausibly suggests it caused any physical manifestation of illness.

As for cleaning supplies, Grissom faults the Jail for not providing cleaning supplies, but he concedes it did provide supplies, just not the bleach he wanted.  And dirty conditions in the jail were the result of Grissom's and other detainees' not using those supplies.  No reasonable jury could find that this constituted a denial of one of life's necessities or posed a substantial risk of harm.

Grissom complains about some other conditions in his complaint—like lack of working sinks—but does not point to any evidence about those conditions suggesting they posed an objectively serious condition.  And even considering all the alleged conditions in combination, while they describe an unpleasant environment, they do not describe a situation intolerable or inhumane.

Based on the evidence, no reasonable jury could find Grissom was denied "the minimal civilized measure of life's necessities" or was exposed to conditions "posing a substantial risk of serious harm."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  This is the threshold requirement

for an Eighth or Fourteenth Amendment conditions of confinement claim.  Since Grissom cannot prove his conditions of confinement were objectively serious, the Court must grant Watson's motion for summary judgment.

In light of this ruling, the Court need not consider whether Grissom's ankle pain or sleeplessness constitute physical injuries sufficient to satisfy 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury. . . .").

## V.   Conclusion

For the foregoing reasons, the Court:

- **GRANTS in part** and **DENIES in part** the motion for summary judgment filed by Dr. Marcowitz (Doc. 66).  The motion is **DENIED** to the extent it asserts a claim that Dr. Marcowitz persisted in a known ineffective treatment and is **GRANTED** in all other respects;

- **GRANTS** the motion for summary judgment filed by Sheriff Watson (Doc. 68); and

- **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case.

The Court will schedule a telephone status conference by separate order to select dates for the Final Pretrial Conference and Jury Trial.

**IT IS SO ORDERED.**
**DATED:  February 28, 2023**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**